IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SUSAN W. COGAR,

       Plaintiff,

v.                                    Civil Action No. 2:04cv9
                                        (Judge Maxwell)

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.

## **REPORT AND RECOMMENDATION**

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f. The matter is awaiting decision on the parties' cross Motions for Summary Judgment, and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## **I. Procedural History**

Susan W. Cogar ("Plaintiff") filed her application for SSI on October 6, 2000 (protective filing date), alleging disability beginning October 1, 1999, due to "nerve in hip," arthritis in back, neck, hands, feet, and legs, and heart and bladder problems (R. 85, 90). The application was denied initially and on reconsideration (R. 42, 43). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Jeff Speedslot held on February 21, 2002 (R. 350). Plaintiff, represented by counsel, testified on her own behalf, along with Vocational Expert Tim Mueller ("VE"). By decision dated April 18, 2002, a different ALJ, Steven D. Slahta, denied benefits (R. 40A). The Appeals Council

denied Plaintiff's request for review on March 10, 2003, rendering the ALJ's decision the final decision of the Commissioner (R. 12). Plaintiff filed her complaint in this Court on February 11, 2004. On May 26, 2004, the Court remanded the matter to the Commissioner due to the loss of the claim file. By Court Order dated August 29, 2005, this matter was reinstated.

## II. Statement of Facts

Plaintiff was born on February 28, 1953, and was 49 years old years old at the time of the ALJ's decision (R. 352). She went to school to the 11th grade and obtained her GED and has past relevant work as a personal care provider for about two years (R. 91, 353). She reported she had stopped working in December 1997, because her "job ended" (R. 90)[1].

Plaintiff saw her doctor on December 11, 1997, for complaints of a possible sinus infection (R. 192). Her medications at the time were listed as Premarin, Hydrochlorot for hypertension, Potassium, a multivitamin, garlic, vitamin E, and Calcium. The doctor diagnosed allergic rhinitis and sinusitis.

On October 16, 1998, Plaintiff presented to her doctor with complaints of chest pain with pressure (R. 190). Her medications remained the same. Her doctor diagnosed high blood pressure, supraventricular tachycardia ("SVT") v. stress, allergy v. pharyngitis, poor dental health, and moderate obesity. Ziac was added to her medications for hypertension.

In November 1998, Plaintiff followed up for her chest pain and high blood pressure (R. 189). She reported a lot of heart burn and a history of chest pain from heartburn. The doctor diagnosed palpitations vs. SVT, gastroesophageal reflux disease ("GERD"), and surgical menopause.

---

[1]It appears from the record that the individual for whom Plaintiff was caring entered a nursing facility.

In December 1998, Plaintiff told her doctor she had had the flu and took some Aleve for pain (R. 188). She had heart palpitations during this time. She had no complaints of chest pain since her last visit. She complained of pain in her hands, shoulders, and legs, worse in the morning, and with changes in the weather. She reported her stress level was "up and down" as she lived beside her mother-in-law. As long as she was taking her Premarin she had no mood swings or hot flashes. She had mild stomach pain with spicy food, which resolved with anti-gas medication. The doctor diagnosed high blood pressure and heart palpitations with increased blood pressure.

In February 1999, Plaintiff followed up with her doctor regarding her hypertension (R. 187). She complained of tingling in her hands which woke her up at night. She also had occasional episodes of palpitations at night lasting only a few seconds. She denied any shortness of breath, chest pain or dizziness. She had no other complaints. The doctor diagnosed hypertension controlled on Ziac, and carpal tunnel syndrome for which Plaintiff did not want any treatment at the time. She was told to monitor the tingling in her hands, and that the doctor would consider further work-up if the problem worsened in the future.

In April 1999, Plaintiff presented to her doctor for her annual physical examination (R. 184). She complained of sinusitis and numbness in her hands, mostly the left. She said her hands became very numb and tingly at night and turned white and painful when cold and red and hot when warm. Upon examination, the phalanges of Plaintiff's left hand were a slight blue color. Plaintiff stated the palm of her left hand felt more numb than the right on pin prick. Reflexes were normal and muscle strength was close to 90%. The doctor diagnosed hypertension, well controlled on Ziac, bilateral carpal tunnel syndrome, left worse than right, and allergic rhinitis. She prescribed a wrist splint.

In May 1999, Plaintiff followed up regarding her sinus problems (R. 183). The diagnosis was

3

heart palpitations (SVT tachycardia) controlled with beta blockers, and allergy.

On July 23, 1999, Plaintiff presented to Dr. Cynthia Osborne for a check up (R. 266). She was concerned about cardiovascular disease because of a family history of coronary artery disease and early heart attack. Plaintiff was 46 years old and appeared anxious and concerned. Her blood pressure was 152 over 102. Dr. Osborne diagnosed hypertension, hypercholesterolemia, allergic rhinitis, and arthritis. She recommended a low fat/ low cholesterol/ low salt diet, increased exercise and fluid, and support hose, and scheduled Plaintiff for a Holter monitor due to her concerns over heart disease.

On August 26, 1999, Plaintiff complained to Dr. Osborne of waking up with headaches for about two to three months (R. 265). She could tell her blood pressure was up. She had been under a lot of stress since July. Her heart began racing twice during the past week. She had not been following her diet or exercise plan, but said she would. Her diagnosis was hypertension.

On September 14, 1999, Plaintiff complained to Dr. Osborne of a cold with sore throat, cough, ear pain, runny nose, and congestion (R. 264). She was diagnosed with an ear infection. One week later the ear infection had resolved (R. 263).

On October 26, 1999, Plaintiff complained to Dr. Osborne of "painful sensations" around her right shoulder and left hip with pain, numbness, and tingling in the right leg (R. 262). Upon examination, Plaintiff had decreased range of motion of the right shoulder due to pain, with tenderness on palpation. Her left hip had pain on extension and tenderness to palpation. Dr. Osborne diagnosed left sciatica and right shoulder bursitis and hypertension.

On December 28, 1999, Plaintiff complained to Dr. Osborne of "some heartburn @ times" [sic] (R. 261). She reported her shoulder was better, but she still had some hip pain. The diagnosis

4

was hypertension, sciatica, and GERD.

On January 24, 2000, Plaintiff told Dr. Osborne she felt okay, although she still had some drainage (R. 260). The doctor noted Plaintiff had a wood stove. She diagnosed allergic rhinitis and hypertension.

On March 9, 2000, Plaintiff complained to Dr. Osborne of a constant headache for one month (R. 259). She also stated that her heart was beating too fast off and on again for the past month. The doctor diagnosed hypertension and headache.

On April 27, 2000, Plaintiff complained she was still having a lot of headaches (R. 257). The headaches had been better when she first started her medication. Her fast heartbeat was better, but she had swelling of the toe, and some weak and shaky spells when she ate cake. She noted a family history of diabetes. The doctor diagnosed hypertension and hyperglycemia.

On May 26, 2000, Plaintiff reported her headaches were decreasing in severity and frequency (R. 256). Her shaky spells had also decreased. The diagnosis remained hypertension and hyperglycemia.

On June 28, 2000, Plaintiff complained of her back and ribs hurting, plus some hip pain and her leg starting to tingle again (R. 254). Dr. Osborne diagnosed right sciatica and muscle spasm (R. 254).

An August 31, 2000, x-ray of the lumbar spine showed "[s]mall osteophyte formation here and there" and facet arthropathy at the lumbosacral region (R. 270).

On September 28, 2000, Plaintiff reported her back pain had not improved, and she was having numbness, tingling, and occasional muscle spasms (R. 250). She still had reflux problems, but they were helped with Axid. Plaintiff brought literature regarding rheumatoid arthritis with her

5

to the doctor's office. Dr. Osborne diagnosed hypertension, borderline diabetes, GERD, and back pain due to osteoarthritis.

Plaintiff filed her application for SSI on October 6, 2000 (protective filing date), alleging disability beginning October 1, 1999, due to nerve in hip, arthritis in back, neck, hand, feet, and legs, and heart and bladder problems (R. 85, 90).

The SSA employee who assisted Plaintiff in filing her Disability Report on October 19, 2000, did not observe any difficulties (R. 87). She also noted Plaintiff had good personal hygiene, was nicely dressed, and was "some what overweight – but carries it well" She wrote:

> She remarks that she doubts that she's totally disabled – but her doctor wanted her to try for this. [] has no funds to get her medicines.

On October 24, 2000, Plaintiff reported she still had headaches with some nasal congestion (R. 248). She was also having bladder problems – increased urination without burning. She had occasional stress incontinence. She said she was in a lot of pain. Dr. Osborne diagnosed arthralgias.

On November 9, 2000, Plaintiff told Dr. Osborne that Toradol "helped a great deal" (R. 249). Dr. Osborne diagnosed arthralgias. She also filled out a form for the State Department of Health and Human Resources ("DHHR"), stating that upon examination, Plaintiff's posture and gait were normal (R. 204). She had decreased hand grip. She had decreased range of motion of the legs, arms, back, and left hip greater than right, and was "slow to get up off table." Plaintiff described moderate to severe constant pain in her hands, feet, back, and hip, stating she felt it was arthritis, but that it was worse now (R. 205). Dr. Osborne diagnosed arthralgias and hypertension with tachycardia. She opined Plaintiff was not able to perform her customary occupation or other full time work due to decreased range of motion, pain, and joint inflammation. Dr. Osborne opined that Plaintiff's disability would last one year, because she needed further work-up and evaluation to assess whether

she had rheumatoid or some other inflammatory arthritis. The doctor recommended further testing such as "rheumatoid, lupus testing, etc.," further x-rays, and possible consultation with a rheumatologist, as well as physical therapy and medication. She did not refer Plaintiff for vocational rehabilitation.

On November 21, 2000, State agency reviewing physician Fulvio Franyutti, M.D., completed a Physical Residual Functional Capacity Assessment ("RFC"), for a primary diagnosis of arthralgias and secondary diagnoses of back pain and hypertension (R. 207). He noted Plaintiff's allegations of "nerve in hip," arthritis, and back, neck, hand, feet, legs, heart, and bladder problems. Dr. Franyutti opined Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, could stand and/or walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday. She would have no other physical limitations. He reduced Plaintiff's RFC to medium due to pain (R. 212).

On November 26, 2000, Plaintiff presented to the hospital with complaints of severe headache for four days, pain in back, ribs, neck, and abdomen, and dizziness (R. 244). The pain had since resolved except for in the rib area. She had tenderness in these areas. She also had nausea and diarrhea. She was discharged about two hours later with a diagnosis of gastritis and viral gastroenteritis.

On December 8, 2000, Plaintiff's blood pressure was 108/70 (R. 243). Dr. Osborne diagnosed bursitis and arthralgias.

On February 8, 2001, Plaintiff reported back pain and a heel spur (R. 242). Her blood pressure was 118/68. Dr. Osborne diagnosed osteoarthritis, heel spur, and allergic rhinitis.

On March 9, 2001, Plaintiff told her doctor that Celebrex had helped "some," but her feet and

hands turned colors (R. 241). She had an anti-nuclear antibodies test (ANA) and Rheumatoid Arthritis (RA) test that same day, which were both negative (R. 215).

On March 17, 2001, Plaintiff underwent a barium enema for complaints of abdominal pain (R. 220). The results were negative.

On April 16, 2001, Plaintiff reported her symptoms were all about the same– she had pains in her elbows, back, knees with increased working, walking, and bike riding (R. 240). She also reported marked arm swelling and stiffness. Dr. Osborne noted swelling of the hands and feet and an antalgic gait. She opined Plaintiff needed to see a rheumatologist regarding her arm stiffness and marked joint swelling with some redness.

A May 1, 2001, CT of the head for complaints of ataxia and numbness was normal (R. 234).

On May 22, 2001, State agency reviewing physician Hugh M. Brown, M.D. completed an RFC based on multiple arthralgias, opining that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could stand and/or walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday (R. 227). He found she would be able to perform all postural limitations occasionally and should avoid concentrated exposure to extreme heat and cold due to multiple arthralgias. Dr. Brown noted Dr. Osborne's examination of November 2000, and opined that he agreed Plaintiff could not tolerate heavy work but should be able to perform at a light RFC while being medically investigated for rheumatoid arthritis (R. 232).

On May 29, 2001, Plaintiff's doctor noted that a podiatrist recommended orthotic inserts (R. 239). Plaintiff reported neck swelling that was worse some days, but medication was helping. Her neuropathy symptoms were also better with Neurontin. Dr. Osborne diagnosed arthralgias, hypertension, hypoglycemia, and referred Plaintiff to a rheumatologist.

On June 28, 2001, rheumatologist Dr. Wassim Saikali, M.D. examined Plaintiff on referral from Dr. Osborne (R. 235). He opined that Plaintiff's history and exam were "suggestive" of fibromyalgia and mild depression. He noted there was no clinical evidence of rheumatoid arthritis or lupus. He wanted to check her CBC, comprehensive metabolic profile, ESR, TSH, rheumatoid factor, and ANA. He agreed with the medication Neurontin, but recommended a higher dose "for her symptoms of some sciatica . . . .Although the exam was normal with normal reflexes, this could be related to her fibromyalgia." He also prescribed Zoloft and possibly Baclofen. He would consider Ultram later on and would reevaluate her in six to eight weeks.

On July 18, 2001, Plaintiff followed up with Dr. Osborne regarding her appointment with Dr. Saikali (R. 238). Dr. Osborne diagnosed fibromyalgia and chest pressure.

On August 16, 2001, Plaintiff underwent a stress test for her complaints of chest pressure (R. 321). The results were normal.

On August 28, 2001, Plaintiff followed up with Dr. Saikali regarding her diagnosis of fibromyalgia and mild depression (R. 324). Plaintiff reported still having generalized aches and pains of the neck, shoulders and arms. She was stiff in the morning for one half hour, but had no swelling. The medication had helped. ANA and RA tests were both negative. Upon examination, Plaintiff had no active swelling or synovitis in MCPs, PIPs, wrists or elbows. Her knees were normal. She had tenderness in the trapezia, nuchal area. Dr. Saikali diagnosed fibromyalgia, noting there was no clinical evidence of rheumatoid arthritis or lupus. He recommended stretching exercises and stress management, and prescribed Baclofen.

On August 30, 2001, Plaintiff followed up with Dr. Osborne (R. 287). Upon examination, Plaintiff had bumps on her upper left arm, a history of fibromyalgia and frequent headaches, and had

had a normal stress test. She reported "doing a little better." The diagnosis remained fibromyalgia and hypertension.

On September 25, 2001, Plaintiff reported the Zoloft was decreasing her appetite and libido, and the Buclofen was causing nightmares (R. 285). Dr. Osborne diagnosed depression, cellulitis of the right index finger, and high blood pressure.

On November 13, 2001, Plaintiff presented to the hospital with complaints of nausea and diarrhea for two days (R. 281). She was discharged one half hour later with a diagnosis of nausea, diarrhea, and viral syndrome (R. 282).

On December 20, 2001, Plaintiff followed up with Dr. Saikali regarding her diagnosis of fibromyalgia (R. 327). Plaintiff complained of increased joint pain and discomfort in the neck and shoulders, especially when exposed to cold weather. The medications helped. She had been switched from Zoloft to Wellbutrin due to the sexual side effects. Upon exam, Plaintiff had no active swelling or synovitis. She had tenderness in the trapezia, nuchal area, lateral epicondyle, and greater trochanteric area. The doctor diagnosed fibromyalgia and chronic pain syndrome.

On January 14, 2002, Plaintiff underwent a psychological evaluation at the request of her attorney (R. 312). Plaintiff reported her daily activities as follows:

> Mrs. Cogar arises at approximately 8:00 a.m., but her bedtime varies. She denied any problems with nightmares and denied any problems with eating. She reported that she takes care of the household but it takes her longer to complete her housework. She states that she does something then sits and rests and then does something else and sits and rests. She used to quilt, cross stitch, and perform crafts, currently, she does none of these things.

(R. 316).

Upon mental status examination, the psychologist noted that Plaintiff's hygiene and grooming were within acceptable limits (R. 317). She made good eye contact and her interpersonal

behavior was polite and cooperative. She reported her mood as being "not too bad." Her observed mood was considered to be somewhat depressed. Her affect was slightly restricted. She made very little spontaneous conversation. She was alert, attentive and fully oriented. She responded to questions in a lucid manner without elaboration. Thought processes were within normal limits. She did report worrying excessively about her husband's health. She denied suicidal or homicidal ideation. Her insight was fair, judgment average, immediate, recent, and remote memory within normal limits, comprehension average, psychomotor within normal limits, and concentration was considered to be within normal limits.

Plaintiff obtained a full scale IQ score of 85, placing her in the low range of intellectual functioning (R. 317). She scored at the 7th grade level in spelling and arithmetic and at post-high school level in reading. Plaintiff's score on the Beck Depression inventory indicated moderate depression, and her score on the Beck Anxiety Inventory indicated severe anxiety.

The psychologist diagnosed major depressive disorder, recurrent, moderate without psychotic features, and assessed her global assessment of functioning ("GAF") as 60.[2]

The psychologists completed a psychiatric review technique ("PRT"), based on depressive syndrome, opining Plaintiff would have a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (R. 304).

The psychologists also completed a Mental RFC assessment opinion that Plaintiff would not

---

[2]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

be markedly limited in any area, but would be moderately limited in her ability to remember locations and work-like procedures; understand, remember and carry out very short and simple instructions; understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and set realistic goals or make plans independently of others (R. 308-309). She was otherwise either not limited or not significantly limited.

On January 21, 2002, Dr. Saikali completed a "Fibromyalgia Residual Functional Questionnaire" provided by counsel for Plaintiff (R. 328). The form begins with a paragraph which provides:

> This questionnaire has been modified from the Fibromyalgia Impact Assessment Form developed by John Mason and others. It was created especially to fill the need for a meaningful form to show specific disabilities common to people with FMS and FMS/MPS[3] Complex. Filling out copies of this form may make the difference between your patient receiving or being denied disability benefits.

(R. 328).

Dr. Saikali stated on the form that Plaintiff's impairments lasted or were expected to last at least 12 months. Her prognosis was fair to poor. He identified the clinical findings, laboratory and test results that supported his opinion as "multiple joint, muscle pain with tender points on exam." He checked off symptoms from a list, including multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, subjective swelling, irritable bowel syndrome, depression, multiple trigger points, numbness and tingling, Raynaud's Phenomenon, frequent severe headaches, and myofascial pain syndrome. He stated Plaintiff's pain was located in the lumbosacral and cervical spine, and

---

[3]Fibromyalgia Syndrome/Myofascial Pain Syndrome.

both shoulders, arms, hands, hips, legs, knees, ankles, and feet. The pain was continuous and dull, with bouts of flare. Stress and changing weather precipitated pain. He opined Plaintiff was not a malingerer. He felt emotional factors did contribute to the severity of her symptoms. He opined that Plaintiff frequently experienced pain sufficiently severe to interfere with attention and concentration. He opined she had a marked limitation in her ability to deal with work stress. He believed she could walk two blocks, and found her moderately limited in her ability to work in a competitive work situation.

Dr. Saikali opined that Plaintiff could only sit or stand/walk less than two hours due to back pain (R. 331). He also opined she could not work an eight-hour work day due to complaints of muscle and joint pain in her back and other joints. Where asked if Plaintiff needed a job that permitted shifting positions as will, the doctor stated she might benefit from rehab or physical therapy first. He opined she would need to lie down at unpredictable intervals during a work shift He opined she could lift less than 10 pounds occasionally because she "dropped things" and said he needed to rule out carpal tunnel syndrome.

He opined Plaintiff would sometimes have significant limitations in reaching, handling or fingering. She could only bend and twist at the waist occasionally due to "complaints of low back pain." He opined that, on average, Plaintiff's impairments and treatment would cause her to be absent from work more than three times a month. He also found Plaintiff's stress and depression made her symptoms worse. He finally opined Plaintiff was disabled from engaging in all full time work activity, but could not judge whether she had been disabled prior to June 28, 2001.

**Evidence Submitted to the Appeals Council**

Following the ALJ's determination, Plaintiff submitted the following to the Appeals Council:

13

A report of an exam conducted by Dr. Osborne for the State DHHR on October 30, 2001 (R. 343). Plaintiff's statement of disability was "no energy, fatigue, can't lift, can't stand long periods." She described constant pain in her hands, elbows, shoulders, legs, back, and ribs. Dr. Osborne's diagnosis was fibromyalgia and arthralgia with a "minor" diagnosis of depression. She opined that Plaintiff could not work at her customary occupation due to fatigue and arthralgia. She then opined that Plaintiff was able to perform other full time work at the limited sedentary level due to complaints of pain and fatigue. When asked the duration of Plaintiff's inability to work, Dr. Osborne checked "never." She did not note any work situations that should be avoided, and did not recommend referring Plaintiff to vocational rehabilitation. Under Summary of Conclusions Dr. Osborne wrote:

> Although physical findings are minimal, her c/o fatigue, arthralgias [mean] she would be capable of sedentary-light on limited basis.

(R. 344).

On December 6, 2001, the State agency performed a Disability/Incapacity Evaluation, finding Plaintiff was disabled due to a medically determinable impairment or combination of impairments which significantly limited her ability to perform basic work activity (R. 347). The reviewer found Plaintiff met or equaled a listing.

On December 12, 2001, Plaintiff reported to Dr. Osborne that she had decreased appetite, nausea with some diarrhea, and increased pain with the cool temperatures (R. 345). Dr. Osborne noted Plaintiff had a slow moving gait and arthralgias, and diagnosed fibromyalgia and hypertension.

On January 21, 2002, Plaintiff presented to Dr. Saikali complaining of worsening symptoms (R. 349). She had generalized pain and aches involving her shoulders, ribs, back, and knees. The pain was moderate to severe, and associated with stiffness. She had not taken one medication due

14

to her GI problems. She also complained of headaches and numbness in the upper extremities. She complained of being tired and fatigued. She had bloating and diarrhea. She was unable to open a jar and required help at home. Upon examination, Plaintiff was in no acute distress, and was depressed-looking and well groomed. She had no active swelling or synovitis in the MCPs, PIPs, wrists, elbows or shoulders. She had tenderness in the trapezia, nuchal area and lateral epicondyle. Phalen's test was positive.

Dr. Saikali diagnosed severe fibromyalgia of the refractory kind; chronic pain syndrome; and depression. He noted there was no clinical evidence of rheumatoid arthritis and no muscle atrophy, and noted she had good motor power, but that she continued to complain of severe symptoms. He recommended EMG nerve conduction studies for carpal tunnel and kept her on Neurontin. He then opined Plaintiff was "disabled for the next 12 months because of the severity of the pain and fibromyalgia and depression." He also recommended psychiatric evaluation.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant has an impairment, or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR § 416.927).

15

6. The claimant has the following residual functional capacity: she is able to perform light work with a sit/stand option requiring no repetitive bending; work is performed in a clean air environment; work must be unskilled routine repetitive low stress involving simple one-two instructions and tasks; and involve things rather than people; and is entry level [sic].

7. The claimant is unable to perform any of her past relevant work (20 CFR § 416.965).

8. The claimant is a "younger individual between the ages of 18 and 49" (20 CFR § 416.963).

9. The claimant has a "high school (or high school equivalent) education" (20 CFR § 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (10 CFR § 416.968).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a hand packer of which 202,000 positions exist nationally and 250 positions exist regionally; as a labeler/markers of which 64,000 positions exist nationally and 215 positions exist regionally; as a laundry folder of which 48,000 positions exist nationally and 125 positions exist regionally; and as an inspector/checker of which 111,000 positions exist nationally and 500 positions exist regionally.

13. Because the claimant can perform a range of light work it is assumed that she retains the residual functional capacity to perform a significant range of sedentary work. Using Medical-Vocational Rule 201.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a surveillance system monitor of which 15,000 positions exist nationally and 40 positions exist regionally; as an addresser of which 100,000 positions exist nationally and 150 positions exist regionally; as an inspector/checker of which 37,000 positions exist nationally and 100 positions exist regionally; as a sorter/grader of which 20,000 positions exist nationally and 50 positions exist regionally; and as a stock inventory clerk of which 30,000 positions exist nationally and 60 positions exist regionally.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. (20 CFR § 416.920(f)).

(R.39-40).

## IV. The Parties' Contentions

Plaintiff contends:

1.    The ALJ did not weigh the evidence from treating physicians by the correct regulatory factors, improperly rejected without adequate explanation the medical opinions of the treating physicians regarding the physical limitations of the plaintiff, which robbed his physical RFC finding of substantial support in the record.

2.    The ALJ's mental RFC findings are not supported by substantial evidence when the ALJ erroneously stated that he relied upon State agency examiner and consultants when there were none in the record, and failed to include in his mental RFC the specific mental limitations in the only report and assessment by mental health professionals in the record.

3.    The ALJ relied upon an incomplete, inadequate question to the VE which did not include all of the plaintiff's limitations as set forth in the record, and ignored the favorable testimony of the expert ruling out all jobs when limitations taken from treating and examining sources in the record were considered.


Defendant contends:

1.    The ALJ properly weighed the medical evidence in determining that Plaintiff had the physical ability to work.

2.    The ALJ properly weighed the medical evidence in determining that Plaintiff had the mental ability to work.

3.    The ALJ properly relied on the Vocational Evidence.


## V. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Treating Physician Opinions and Physical RFC

Plaintiff first argues: "The ALJ did not weigh the evidence from treating physicians by the correct regulatory factors, improperly rejected without adequate explanation the medical opinions of the treating physicians regarding the physical limitations of the plaintiff, which robbed his physical RFC finding of substantial support in the record." Defendant contends the ALJ properly weighed the medical evidence in determining that Plaintiff had the physical ability to work.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). In Craig, however, the Fourth Circuit also held:

18

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

The ALJ noted Dr. Osborne's report to the State DHHR on November 9, 2000, which stated that Plaintiff would be unable to perform any full time work for 12 months due to decreased range of motion, pain, and joint inflammation. He also noted, however, that the doctor based this opinion on her belief that Plaintiff had rheumatoid arthritis or another inflammatory arthritis, and needed further testing for these diseases.

On May 22, 2001, State agency reviewing physician Hugh M. Brown, M.D. completed an RFC based on multiple arthralgias. He noted Dr. Osborne's examination of November 9, 2000, and agreed Plaintiff could not tolerate heavy work but felt she should be able to perform at a light RFC while being medically investigated for rheumatoid arthritis (R. 232).

Subsequent testing performed within 12 months of Dr. Osborne's opinion indicated Plaintiff did not have rheumatoid arthritis or another inflammatory arthritis. The ALJ therefore properly did not give great weight to Dr. Osborne's opinion that Plaintiff was disabled for the next 12 months while being tested for inflammatory arthritis.

Plaintiff began seeing Dr. Saikali in June 2001. He opined that Plaintiff's history and exam were "suggestive" of fibromyalgia and mild depression. He confirmed there was no clinical

evidence of rheumatoid arthritis or lupus. He noted she had "symptoms of some sciatica," but then stated that her "exam was normal with normal reflexes," and therefore opined the "symptoms of some sciatica . . . .could be related to her fibromyalgia."

On August 28, 2001, Plaintiff followed up with Dr. Saikali, reporting she still had generalized aches and pains of the neck, shoulders and arms. She was stiff in the morning for one half hour, but had no swelling. She reported that the medication had helped. ANA and RA tests were still both negative. Upon examination, Plaintiff had no active swelling or synovitis in MCPs, PIPs, wrists or elbows. Her knees were normal. She did have tenderness in the trapezia and nuchal areas bilaterally (four areas total).[4] Dr. Saikali diagnosed fibromyalgia, noting there was no clinical evidence of rheumatoid arthritis or lupus. He recommended stretching exercises and stress management, and prescribed Baclofen.

On December 20, 2001, Plaintiff complained to Dr. Saikali of increased joint pain and discomfort in the neck and shoulders, especially when exposed to cold weather. She again stated that the medications helped. She had been switched from Zoloft to Wellbutrin due to the sexual side effects. Upon exam, Plaintiff again had no active swelling or synovitis. She had tenderness in the trapezia, nuchal area, lateral epicondyle, and greater trochanteric areas bilaterally (eight areas total).

In January 2002, Dr. Saikali opined that Plaintiff's disability was expected to last at least 12 months and her prognosis was fair to poor. He identified the clinical findings, laboratory and test results that supported his opinion as only "multiple joint, muscle pain with tender points on exam."

---

[4]The American College of Rheumatologists 1990 Criteria for Classification of Fibromyalgia includes tenderness in 11 of 18 tender or trigger points. The 18 areas are the occiput, low cervical, trapezius, supraspinatus, second rib, lateral epicondyle, gluteal, greater trochanter, and knee (two of each). See The National Fibromyalgia Research Association website at www.nfra.net.

He opined that Plaintiff frequently experienced pain sufficiently severe to interfere with attention and concentration. He opined she had a marked limitation in her ability to deal with work stress. He believed she could walk two blocks, and found her moderately limited in her ability to work in a competitive work situation. He also opined she could not work an eight-hour work day due to "complaints of" muscle and joint pain in her back and other joints. Where asked if Plaintiff needed a job that permitted shifting positions at will, the doctor stated she might benefit from rehab or physical therapy first. He opined she would need to lie down at unpredictable intervals during a work shift. He opined she could lift less than 10 pounds occasionally because she reported she "dropped things." He stated he needed to rule out carpal tunnel syndrome. He opined that, on average, Plaintiff's impairments and treatment would cause her to be absent from work more than three times a month. He also found Plaintiff's stress and depression made her symptoms worse. He finally opined Plaintiff was disabled from engaging in all full time work activity, but could not judge whether she had been disabled prior to June 28, 2001.

The ALJ found Dr. Saikali's opinion was not supported by the evidence. The undersigned finds substantial evidence supports that finding. Neither the clinical evidence nor the doctor's own office notes support his opinion regarding the severity of Plaintiff's impairments and limitations or his opinion that Plaintiff would be disabled from all work. There were no clinical findings, signs or laboratory test results that supported the opinion except for "tender points on exam," of which Plaintiff had, at most, eight.

The ALJ did find Dr. Brown's opinion was supported by the record. 20 CFR § 404.1527(f)(2)(i) provides, in pertinent part:

> State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts

21

in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Plaintiff complains that Dr. Brown's opinion was "made on 5/22/01 despite the very incomplete record at that time." Plaintiff filed her application for SSI on October 6, 2000, alleging disability beginning October 1, 1999. The ALJ had Plaintiff's treating physician records beginning in 1997. The Administrative hearing was held in early 2002. The undersigned does not believe the record in May 2001 was "very incomplete." The undersigned further finds substantial evidence supports the ALJ's determination that Dr. Brown's opinion was supported by the clinical evidence, and his granting more weight to Dr. Brown's opinion than Dr. Osborne's or Dr. Saikali's.

After the ALJ decision, Plaintiff submitted further records to the Appeals Council.[5] Dr. Osborne, Plaintiff's long-time treating physician, opined in October 2001 (before the Administrative Hearing):

Although physical findings are minimal, her [complaints of] fatigue, arthralgias [mean] she would be capable [of] sedentary-light on limited basis.

Dr. Osborne stated on another part of the form that Plaintiff was able to perform full time work at a limited sedentary level. She did not suggest any work situations that should be avoided.

This later opinion, provided by a long-time treating physician, substantially supports the ALJ's determination regarding not only Dr. Osborne's opinion of 11 months earlier, but also his reliance on Dr. Brown's opinion and his ultimate conclusion that Plaintiff could perform limited

---

[5]The Court reviews the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Commissioner's findings. Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991).

light and sedentary work.

A report of an examination by Dr. Saikali in January 2002, was also submitted to the Appeals Council. During that examination, the doctor found that Plaintiff had no active swelling or synovitis. There was no clinical evidence of rheumatoid arthritis. There was no muscle atrophy. She had good motor power. The only positive findings were tenderness in the trapezia, nuchal area, and lateral epicondyle bilaterally (six areas) and a positive Phalen's test. He noted, however, that Plaintiff continued to complain of severe symptoms. He also noted she was "depressed looking." Based on these findings, Dr. Saikali diagnosed severe fibromyalgia of the refractory kind, chronic pain syndrome, and depression, and opined Plaintiff was "disabled for the next 12 months because of the severity of the pain and fibromyalgia and depression."

Again, the undersigned finds Dr. Saikali's opinion is not supported by the clinical evidence or his own office notes. In addition, it is inconsistent with other substantial evidence, including that of Plaintiff's long-time treating physician.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's findings regarding the physician opinions in this matter and his Physical Residual Functional Capacity Assessment.

### C. Mental Impairments

Plaintiff next argues: "The ALJ's mental RFC findings are not supported by substantial evidence when the ALJ erroneously stated that he relied upon State agency examiner and consultants when there were none in the record, and failed to include in his mental RFC the specific mental limitations in the only report and assessment by mental health professionals in the record." Defendant contends the ALJ properly weighed the medical evidence in determining that Plaintiff had

23

the mental ability to work.

Plaintiff did not claim any mental impairments in her various documents submitted to the Administration through May 2001. The first discussion of a mental impairment is in June 28, 2001, when Dr. Saikali opined that Plaintiff's history and exam were "suggestive" of fibromyalgia and mild depression and prescribed Zoloft. Despite this report, Dr. Osborne did not even mention depression at Plaintiff's next two visits in July and August 2001. In August, Dr. Saikali still referred to "mild depression," but then stated that Zoloft helped. His only diagnosis on this date was fibromyalgia. The first time Dr. Osborne mentioned depression was in September 2001, when Plaintiff reported the Zoloft was causing decreased appetite and libido. Dr. Osborne then diagnosed depression and switched Plaintiff to Wellbutrin. At Plaintiff's next visit with Dr. Saikali in December 2001, depression was not even mentioned except for indirectly, where the doctor noted Plaintiff had been switched from Zoloft to Wellbutrin. Dr. Saikali noted Plaintiff was following up for her fibromyalgia, and diagnosed only fibromyalgia.

Plaintiff was subsequently referred by her counsel for a psychological evaluation. Plaintiff denied any mental health treatment. She reported her mood as being "not too bad." Her observed mood was considered to be "somewhat depressed" and her affect "slightly restricted." She was alert, attentive, and fully oriented and responded to questions in a lucid manner without elaboration. Her thought processes were within normal limits, her insight was fair, her judgment was average, her immediate, recent, and remote memory were within normal limits, her comprehension was average, her psychomotor was within normal limits, and her concentration was considered to be within normal limits. She denied suicidal or homicidal ideation, but did report worrying excessively about her husband's health.

24

The psychologists diagnosed major depressive disorder, recurrent, moderate without psychotic features, and assessed her global assessment of functioning ("GAF") as 60, which denotes moderate symptoms, but is only one point below the GAF denoting only some mild symptoms.

The psychologists completed a psychiatric review technique ("PRT"), based on depressive syndrome, opining Plaintiff would have only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (R. 304).

The ALJ quoted from the report of the examination and incorporated the psychologists' PRT into his own.

Plaintiff argues that the ALJ did not include the specific limitations found by the consultative psychologists in their Residual Functional Capacity Assessment, including moderate limitations in her ability to remember locations and work-like procedures; understand, remember and carry out very short and simple instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and set realistic goals or make plans independently of others (R. 308-309).

First, the undersigned finds the limitations in the MRFC are not supported by the psychologists' own evaluation, from which the ALJ quoted. The moderate limitations on remembering locations and work-like procedures; understanding, remembering and carrying out very short and simple instructions; and concentration, for example, are inconsistent with the psychologists' own findings upon examination that Plaintiff's thought processes were within normal limits, her insight was fair, judgment was average, immediate, recent, and remote memory were

25

within normal limits, her comprehension was average, psychomotor was within normal limits, and her concentration was considered to be within normal limits.

Second, the ALJ did quote from the actual psychological evaluation and incorporated the psychologists' PRT into his own.

Finally, the ALJ's RFC included the significant limitations that Plaintiff could perform only entry level, unskilled, routine, repetitive, low stress work involving simple one-two step instructions and tasks, and involving things rather than people.

The undersigned finds the ALJ's mental RFC is consistent with the evaluation performed by the examining psychologists; the PRT of the examining psychologists; Plaintiff's lack of any history of mental health treatment; the very conservative treatment by Plaintiff's own physicians including the lack of a referral for any mental health treatment; and Plaintiff's own daily activities and description of her symptoms. The undersigned therefore finds substantial evidence supports the ALJ's mental RFC.

### D. Hypothetical to the VE

Plaintiff next argues: "The ALJ relied upon an incomplete, inadequate question to the VE which did not include all of the plaintiff's limitations as set forth in the record, and ignored the favorable testimony of the expert ruling out all jobs when limitations taken from treating and examining sources in the record were considered." Defendant contends the ALJ properly relied on the Vocational Evidence. "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). Plaintiff first argues the ALJ misquoted Dr. Saikali's questionnaire in posing his second hypothetical question regarding sitting, standing, and walking, and the VE's answer is

thus not helpful. Even if true, however, it is clear that crediting Dr. Saikali's opinion that Plaintiff could not work an eight-hour day due to her "complaints of muscle and joint pain in back and other joints" would preclude all employment. Further, the VE testified that Plaintiff's missing more than three days per month, as Dr. Saikali opined she would, would also preclude all employment. Additionally, a need to take breaks in excess of those normally allowed would also preclude employment. Finally, the VE testified that all jobs would be ruled out based on the psychologists' MRFC stating Plaintiff would have moderate limitations in performing a normal workday or workweek without too many interruptions and performing at a consistent pace without an unreasonable number of breaks.

In <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir 1999), the Fourth Circuit held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. The Fourth Circuit has recently held that a hypothetical question is unimpeachable if it "adequately reflect[s]" a residual functional capacity for which the ALJ had sufficient evidence. <u>See</u> <u>Johnson v. Barnhart</u>, 434 F.3d 650 (4th Cir. 2005); <u>Fisher v. Barnhart</u>, Slip Copy, 2006 WL 1328700 C.A.4 (W.Va.), 2006 (unpublished).

The limitations about which Plaintiff complains are from the Assessment of Dr. Saikali and the MRFC completed by the examining psychologists. The undersigned has already found that substantial evidence supports the ALJ's rejection of those limitations.

The ALJ found Plaintiff had the residual functional capacity to perform light work with a sit-stand option requiring no repetitive bending, in a clean air environment. The work must be entry level, unskilled, routine repetitive, low stress, involving simple one-two step instructions and tasks, and involving things rather than people. Alternatively, the ALJ found Plaintiff could perform a

significant range of sedentary work with the same limitations.

The ALJ's hypotheticals to the VE assumed a younger individual with a high school equivalent education, with the ability to read and write, precluded from performing all but light (or sedentary) work with a sit-stand option, no repetitive bending, in a clean air environment, performing work that is unskilled and low stress (one and two-step processes, routine and repetitive tasks), primarily working with things rather than people, at the entry level.

These two hypothetical questions "merely incorporated" the ALJ's residual functional capacity determination, which the undersigned has already determined is supported by substantial evidence. The ALJ's hypotheticals to the VE were therefore likewise supported by substantial evidence.

## VI. Recommendation

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's application for SSI, and I accordingly recommend that Defendant's Motion for Summary Judgment [D.E. 16] be **GRANTED**, that Plaintiff's Motion for Summary Judgment [D.E. 15] be **DENIED**, and that this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984),

cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _11_ day of June, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE